RECEIVED
JUN 2 0 2006
ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE, LOUISIANA

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAFAYETTE-OPELOUSAS DIVISION

| | | |
|---|---|---|
| **ARIES MARINE CORPORATION** | * | **CIVIL ACTION NO. 04-570** |
| **VERSUS** | * | **JUDGE RICHARD T. HAIK** |
| **OMS REPAIR, INC.** | * | **MAGISTRATE METHVIN** |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
## JUDGMENT
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Aries Marine Corporation ("Aries") brought suit against OMS Repair, Inc. ("OMS") for damages sustained after an October 14, 2003 crankshaft failure on the Aries offshore supply vessel M/V Elsa Leigh's port main engine. OMS filed a third-party complaint against Gear Services, Inc. ("Gear Services"). A bench trial was held on March 22-24, 2006. Within ten days of the trial's conclusion, the parties filed findings of fact and conclusions of law. After due consideration of the evidence presented at trial, the Court issues the following reasons for judgment:

### I. Facts

*A. The M/V Elsa Leigh and Her Engines*

Aries, a Louisiana corporation, owns and operates supply boats which it charters to assist the oil and gas industry in the Gulf of Mexico. In September 2002, Aries purchased a 253 foot supply boat which was renovated at Bollinger Shipyard in Amelia, Louisiana. The supply boat was christened the M/V Elsa Leigh. The purpose of the Elsa Leigh's renovation was to convert her from an offshore container vessel into an offshore supply vessel. This process included an overhaul of

1

Elsa Leigh's two existing 12-cylinder main diesel "EMD" engines and an increase in horsepower. To that end, Aries hired various marine contractors to work on the two main engines and gear boxes. NREC, a Louisiana corporation specializing in repairing and overhauling marine diesel engines, overhauled the two existing 12-cylinder "EMD" engines. Gear Services, a Louisiana corporation specializing in selling, installing and repairing marine gears, inspected the existing main engine gear boxes, and recommended and supplied replacement gear boxes and "tourque tube" couplings used to attach the overhauled main engines to the gear boxes. These tourque tube assemblies transmit the power from the main engine's fly wheel to the vessel's gears and consist of a flywheel adapter, a cylindrical spool shaped piece known as the tourque tube, and a clutch spacer. OMS, a Texas corporation specializing in aligning and installing marine engines and gear boxes, aligned and installed the gear boxes supplied by Gear Services and the engines overhauled by NREC.

## B. *The Crankshaft Failure*

On October 14, 2003, the Elsa Leigh's port main engine crankshaft fractured while working in the Gulf of Mexico. Darrell Bickham, the vessel's Chief Engineer, testified that the main engines had logged less than 900 hours since being overhauled. Bill Purvis, Aries' port captain, testified that he arranged for NREC and Gear Services to request they board the boat in Fourchon to begin removing the engine while the Elsa Leigh continued on to Hudson Dry Dock in Morgan City for repairs. The engineer logs show that the Elsa Leigh arrived in Fourchon on its starboard main engines on October 17 and at Hudson Dry Dock on October 18.

Marine surveyors inspected the vessel at Hudson Dry Dock. Ed Bergeron, a certified marine surveyor, inspected the port main engine's bearings and the fractured crankshaft at NREC's facility at Hudson Dry Dock. According to Bergeron's investigation, the crankshaft failure was indicative

2

of a bending type break at the aft cheek of the number 6 rod extending to the number 7 journal (i.e. the aft-most section of the crankshaft which connects to the flywheel). Bergeron testified that excessive wear was present on the forward portions of the numbers six and seven top main bearings and the aft thrust washer had a burnt surface. Bergeron testified that the bearing wear and the crankshaft fracture were indicative of misalignment and recommended the starboard engine bearings be inspected for damage. During his investigation, Bergeron also observed that the forward engine foundation bolts on both main engines were "body bound" to the engines with chock fast. Bergeron's description of the bearing wear and the bolts body bound with chock fast is substantially similar to the description in John Wiggins' survey report. It is clear from trial testimony and evidence that both the tourque tube and the clutch spacer were sold as inherently balanced pieces of equipment by their respective manufacturers. The testimony and evidence shows that the tourque tubes were within acceptable balance levels during the entire time they were aboard the vessel.

After replacing the bearings on the starboard main engine and reinstalling the undamaged parts from the port main engine onto a new block, Aries contracted with Homer Dupuy, an alignment specialist with 38 years of experience, to align and install the engines. Dupuy corroborated Bergeron's testimony that the front foundation bolts on the starboard engine were body bound with chock fast, testifying that he had to use a sledgehammer to free the front foundation bolts from the chalk fast in the engine bolt holes.

### C. Marine Engine Alignment

At trial, there was extensive testimony regarding proper "EMD" engine alignment. The evidence is abundantly clear that certain practices must be followed with regard to the installation of EMD engines. EMD engines must be installed with what are called "body bound" foundation

bolts on the aft end of the engine. Body bound bolts have a machined fit between the bolt and the bolt hole, such that the diameter of the bolt is almost precisely the same as the diameter as the bolt hole. However, EMD's installation instructions manual, as well as the installation practices that are standard in the industry, further require that the forward foundation bolts of the EMD engines be installed with bolts that are slightly smaller than the bolt holes. The purpose of not having "body bound" bolts on the front end of an EMD engine is to permit the engine to actually grow slightly in length when the engine reaches its normal operating temperatures. The EMD installation manual warns against installing the forward foundation bolts without providing room for thermal growth forward, stating, "Mounting bolts at governor (front) end must be installed with clearance to allow for thermal expansion of the crankcase in that direction." The EMD installation manual also has a highlighted box which warns in bold type, **"CAUTION Don't ream fit front engine mounting bolts! They must have clearance to allow for thermal expansion of the crankcase!"** The evidence at trial further established that, if chockfast is permitted to enter into the forward bolt holes of an EMD engine, it may fill up the gap between the bolts and the bolt holes, thus effectively making the forward bolt holes "body bound." It is overwhelmingly clear from the evidence that permitting the chock fast to fill the forward bolt holes of an EMD engine contravenes the explicit bold faced instructions for engine installation by essentially making the front end body bound or a ream fit.

## II. Discussion

### A. Liability

This is an admiralty and maritime claim within the jurisdiction of this United States District Court for the Western District of Louisiana pursuant to rule 9(h) of the Federal Rules of Civil

Procedure and 28 U.S.C. §1333. Aries claims that OMS repair breached the warranty of workmanlike performance when it body bound the forward engine foundation bolts with chock fast which, Aries contends, was the sole cause of the engine damage. *Employers Ins. of Wausau v. Suwannee River Spa Lines, Inc.*, 866 F.2d 752, 763 n. 17 (5th Cir. 1989); *Nathaniel Shipping, Inc. v. General Electric Co.*, 932 F.2d 366, 367 (5th Cir. 1991).

The evidence is clear that on March 7, 2003, the OMS alignment specialist, Jacob Blanchard, and an OMS welder/helper, Clint Degeyter, boarded the Elsa Leigh to align the main engines and gear boxes. Although other workers assisted, Blanchard testified that he supervised and controlled all of the alignment work. Blanchard conceded that it was his responsibility to know and follow manufacturer guidelines for proper alignment. Although he had no prior experience with tourque tube couplings, Blanchard admitted that he never referenced any manuals for alignment procedures. Blanchard and Degeyter testified that they did in fact pour chockfast into the forward bolt holes of both the port and starboard main engines of the vessel during the alignment process. Photographs taken after the casualty also showed chockfast lining the inside of bolt holes of the port main engine.

Arthur Sargent, an expert in naval architecture and marine engineering who testified on behalf of Aries and Gear Services, testified that if an EMD engine is installed such that it is body bound on both the forward and aft ends, when the engine undergoes thermal expansion the engine crankcase will actually sag slightly in the middle portion of the engine, as the crankcase lengthens slightly but has no room to grow forward. OMS' expert, Geoff Webster, conceded that this would happen if the engine were body bound on its forward and aft ends, and further testified that "nobody in their right mind" would install an engine such that it was body bound on both ends because it would cause severe damage to the engine and could even cause the engine to "blow up."

5

The evidence is clear that a slight sag in the middle of the engine during thermal expansion due to the EMD engine being body bound on the front and aft end may cause the engine crankshaft to break. A preponderance of the evidence suggests that is what caused the port engine crankshaft failure of the Elsa Leigh. Accordingly, the Court finds that OMS' installation of the engines aboard the Elsa Leigh, in which chock fast was permitted to fill the forward bolt holes, was negligent, contrary to the engine manufacturer's express instructions, contrary to good marine practices, and a breach of the warranty of workmanlike performance. Furthermore, a preponderance of the evidence suggests that OMS' installation of the engines aboard the Elsa Leigh, in which chock fast was permitted to fill the forward bolt holes, was the sole, legal, and proximate cause of the October 14, 2003 crankshaft failure.

OMS, in its defense, claims: 1) the damage was caused by unbalanced tourque tube assemblies furnished by Gear Services; 2) the engines were knocked out of alignment when the Elsa Leigh ran aground; or, 3) Aries failed to mitigate its damages by not requesting OMS to check its alignment work before the crankshaft failure.

OMS' third party claim against Gear Services is governed by general maritime law. In asserting a negligence claim under general maritime law, OMS had the burden of proving that Gear Services owed a duty, breached that duty, and that the breach of the duty was a proximate cause of the crankshaft failure. *Consolidated Aluminum Corp v. C.F. Bean Corp.*, 833 F.2d 65, 67 (5th Cir. 1987); *Gavagan v. United States*, 955 F.2d 1016 (5th Cir. 1992); and *Fournier v. Petroleum Helicopters, Inc.*, 665 F.Supp. 483, 486 (E.D.La. 1987).

With respect to the tourque tube assemblies furnished by Gear Services, Arthur Sargent's testimony is uncontested that the tourque tube assemblies were within industry balancing tolerances

given the assemblies' characteristics and the application for which they were used. OMS failed to carry its burden of proving that the tourque tube assemblies were out of balance, or that Gear Services was negligent. Therefore, OMS failed to prove a breach of a duty owed by Gear Services. Whereas OMS failed to carry its burden of proof on its third party claim against Gear Services, the Court finds that the tourque tube assemblies were acceptably balanced to applicable marine standards and were not a cause of port main engine crankshaft failure. Thus, Gear Services is hereby allocated no fault for the damages sustained by Aries.

With respect to the grounding incident, Webster also opined that, if the Elsa Leigh's engines were damaged by misalignment, the engines were knocked out of alignment by a June 2, 2003 incident in which the Elsa Leigh ran aground in an area near Morgan City called Horseshoe Bend. Despite the voluminous testimony on this issue, there was no direct testimony from anyone who witnessed the grounding at issue. In fact, Webster based his opinion on his erroneous belief that it was a hard grounding. Webster's belief that it was a hard grounding is inconsistent with the testimony of Darrell Bickham, Bill Purvis, Arthur Sargent, and Ed Bergeron. Bickham, Purvis and Sargent testified that Horseshoe Bend is an area in which supply boats run aground frequently. Purvis, Sargent and Bergeron testified that the water bottom consists of soft sand and could not knock the main engines on a 250-foot supply boat out of alignment. Their testimony was also unconstested that the log entry referring to the number one ballast tank indicates that only the bow of the Elsa Leigh ran aground. Finally, Sargent, Bergeron and Purvis's uncontested testimony was that, had the Elsa Leigh run aground hard enough to cause misalignment, there would have been evidence of such in the form of structural damage, a bent propeller shaft, damaged propeller, or the chock fast would have broken under the gear boxes or engines. Bergeron testified that this type of

damage was not present during his survey. Purvis also confirmed that the Elsa Leigh has never suffered this type of engine damage. Webster admitted that he was unaware of the testimony of Bickham, Purvis and Bergeron concerning the grounding.

With respect to OMS' claim that Aries failed to mitigate its damages and this failure was the superseding cause of Aries' damages, the Court finds that the evidence does not support this claim. Specifically, OMS claims that Aries should have known there was a problem with the OMS alignment before the crankshaft failure based on the behavior, sounds and movement of the power train equipment. Bickham and Purvis testified that they do not expect to be able to predict how a particular boat will sound or behave when running normally until they have spent some time on the boat. They also testified that every issue that came up requiring repairs on the power train before October 14, 2003 involved the Gear Services components and Gear Services was contacted on each occasion to address the problem. Purvis and Bickham sent Gear Services technicians to the Elsa Leigh no less than six times before October 14, 2003 to fix or inspect various components on the gear boxes, couplings and clutch system.

At no time before the crankshaft failure did Aries have any problems with how the main engines were operating that would indicate a problem. NREC technicians also visited the boat twice after the renovation, once to perform a regular maintenance inspection and again to fix machinery unrelated to the drive train. NREC also did not find any problems that indicated OMS should be consulted. Purvis, Bickham, and Gear Services' owner, Richard Watler, all testified that they thought Gear Services was the appropriate company to address the problems because all the problems seemed to be stemming from Gear Services' equipment.

OMS contends the primary indications that there was an alignment problem were a banging

8

sound in the gear boxes, the clutch housing "loping" and engine room vibration Bickham described as "more than usual." Bickham and Purvis testified that Gear Services technicians investigated each of these issues and concluded that these were normal sounds and behavior for this equipment. The testimony suggests that Gear Services was correct because the Elsa Leigh has logged over 13,000 hours on the same gear boxes and tourque tube assemblies without a problem with the drive train and the gear boxes continue to make the same banging noises and the clutch housings continue to lope.

Furthermore, Purvis and Bickham testified that they were not experts in aligning engines and trusted that OMS Repair had properly installed the engines based on the verification of the final alignment readings. Here, it is illogical to conclude that one party who contracts for the expert services of another may not rely on the expertise and warranties of the party performing the service. Such conclusion flies in the face of the warranty of workmanlike performance present in marine contracts. Therefore, it is only logical to conclude that Aries acted reasonably in its discovery of the problems and its efforts to remedy the problems with the Elsa Leigh's drive train.

The evidence is clear that the crankshaft failure was caused by the forward foundation bolts being body bound to the engines with chock fast. Blanchard and Degeyter testified that they were both aware that they poured chock fast into the forward foundation bolt holes because they followed the same procedure in every alignment job. They also denied that this was improper until confronted by the actual EMD installation manual's caution on cross-examination. If Aries requested OMS to re-inspect the alignment before October 14, 2003, nothing in evidence shows that they would have detected a misalignment or even had the ability to detect a misalignment since they were unaware of the proper chocking procedure which may cause the engine to become misaligned (i.e. pouring

chock fast into the forward foundation bolt holes essentially making them body bound). Since Blanchard and Degeyter were unaware that chock fast must fill the forward foundation bolt holes of an EMD engine, it is more likely than not that they would have again allowed chock fast into the forward foundation bolt holes if Aries requested them to re-align the Elsa Leigh's engines. Thus, another alignment would not have remedied the problem, but prolonged the risk of crankshaft failure due to thermal expansion from body bound forward foundation bolts.

*B. Damages*

Aries, OMS, and Gear Services submitted joint exhibits, within which are invoices for repair costs paid by Aries as a result of the crankshaft failure. No party challenged the reasonableness of Aries' claimed repair costs. Accordingly, Aries is hereby entitled to recover $231,795.16 in repair costs from OMS.

Aries also contends that it is entitled to the economic loss incurred from the loss of use of the Elsa Leigh during its repairs. Under *Skou v. United States*, 478 F.2d 343, 347 (5th Cir. 1973), "the general measure of the economic loss of a vessel during retention is net profit." In order to determine net profit, the ordinary expenses the shipowner would incur from earning the charter fee must be subtracted from the charter fee. *Id.* "Where the shipowner makes no savings of operating expenses during repairs the charter price is an adequate measure of damage." *Id.* See *Isthmian S.S. Co. v. Jarka Corp.*, 100 F. Supp. 856 (D.Md. 1951); *The Belgenland*, 1888, S.D.N.Y., 36 F. 504.

Here, Purvis testified that Aries' overhead in operating the Elsa Leigh remains constant regardless of whether the boat is under charter or being repaired. Specifically, he testified that the fuel and lube is supplied by the charterer; the crew stays onboard the vessel during its repair; and Aries manned the vessel with a complete crew while it was under repair because Aries keeps the

vessels manned at all times. The boat was off charter from a job with Westport at a $7,000 day rate for eight days during repairs. Since Aries made no savings of operating expenses while the Elsa Leigh underwent repairs, Aries is hereby entitled to the charter price as an adequate measure of damage. *Skou* at 347. Accordingly, Aries is hereby entitled to recover $56,000 ($7,000 per day, for 8 days) from OMS for the loss of use of the Elsa Leigh.

Furthermore, Aries is hereby entitled to recover prejudgment interest from the date of the crankshaft failure, October 14, 2003, post-judgment interest and costs. *See Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F.Supp. 738 (E.D. La. 1989); *City of Milwaukee v. Cement Division, Nat'l Gypsum Co.*, 515 U.S. 189, 115 S.Ct. 2091, 132 L.Ed.2d 148 (1995).

### III. Conclusion

For the foregoing reasons it is HEREBY ORDERED ADJUDGED AND DECREED that OMS' breach of the warranty of workmanlike performance is the sole, legal, and proximate cause of Aries' damages. Furthermore, it is HEREBY ORDERED ADJUDGED AND DECREED that Aries shall recover, from OMS, the following amounts in compensation for damages:

1. $231,795.16 in repair costs.

2. $56,000 in loss of use of the vessel.

3. prejudgment interest from the date of the crankshaft failure, October 14, 2003, post-judgment interest and costs.

THUS DONE AND SIGNED at Lafayette, Louisiana, this 19th day of June 2006.

CHIEF JUDGE RICHARD T. HAIK, SR.
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA

COPY SENT:
DATE: 6-20-06
BY: 
TO: RTH